IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN B. FETTER                :     CIVIL ACTION
                              :
        v.                    :
                              :
NORTH AMERICAN ALCOHOLS,      :
INC., et al.                  :     NO. 06-4088

MEMORANDUM AND ORDER

McLaughlin, J.                           December 10, 2008

John B. Fetter claims that he had an employment contract with North American Alcohols, Inc. ("NAA") to act as chief operating officer of the company, which was formed in 2003 to build and operate an ethanol manufacturing plant in Pennsylvania.  Fetter asserts three claims against NAA and its president and CEO, Stephen C. Reiser:  (1) breach of contract; (2) violation of the Pennsylvania Wage Payment and Collection Law ("WPCL"); and (3) unjust enrichment.

The defendants have moved for summary judgment, arguing that the parties never executed a formal contract, and that neither Reiser nor NAA received any benefit from Fetter's activities.  The Court will grant the defendants' motion with respect to the breach of contract and WPCL claims, but will deny the motion with respect to the unjust enrichment claim.

I.   <u>Background</u>[1]

NAA is a Florida corporation formed by Stephen C. Reiser, the company's president and CEO.  The corporation was founded in November 2003 for the purpose of building and operating an ethanol manufacturing plant.  NAA's plan was for the plant to produce fuel-grade ethanol and certain bi-products on a site in the Keystone Industrial Port Complex in Bucks County, Pennsylvania.  <u>See</u> NAA Business Plan at 4, 7, attached as Ex. 2 to Pl.'s Mot. to Remand.

In January 2006, John B. Fetter attended meetings with Reiser and other representatives of NAA in Philadelphia, Pennsylvania.  At that time, NAA was seeking funding to develop the ethanol plant.  At these meetings, the parties talked about how Fetter could assist in raising capital and in implementing NAA's business plan.  <u>See</u> Fetter Dep. 60-65, Dec. 4, 2007; Reiser Dep. 32-35, Dec. 4, 2007.

In February 2006, Fetter and Reiser discussed the possibility of Fetter's full-time employment with NAA.  On February 27, 2006, Fetter received an email from Reiser.

---

[1] On a motion for summary judgment, a court must view the evidence and draw reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 n.2 (1986). Summary judgment is proper if the pleadings and other evidence on the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Attached to this email was a letter with the subject line, "Employment With North American Alcohols, Inc."  Between February 27, 2006 and March 16, 2006, Reiser and Fetter exchanged various drafts of this document.  See Letters and emails attached as Ex. C to Pl.'s Resp. to Defs.' Mot. for Summ. J. ("Pl.'s Resp."); Fetter Dep. 83-84; Reiser Dep. 47.

On March 16, 2006, Fetter and Reiser met in Philadelphia.  At this meeting, Reiser and Fetter both signed a document entitled "Confidentiality & Non-Circumvention Agreement."  Reiser also signed the most recent draft of the letter entitled "Employment With North American Alcohols, Inc.," dated March 6, 2006 (the "March 6 letter").  Fetter's signature does not appear on the March 6 letter.  See Confidentiality & Non-Circumvention Agreement, Am. Compl. Ex. B; Letter from Stephen C. Reiser, Mar. 6, 2006, attached as Ex. A to Defs.' Mot. for Summ. J. ("Defs.' Mot."); Fetter Dep. 115; Reiser Dep. 46-48.

The first paragraph of the March 6 letter states:

> After discussions with the [NAA] BOD, we are pleased to offer the following, for your consideration.  Please consider this letter an outline of the terms and conditions we discussed, which must be formalized in a contract between NAA and yourself.

Defs.' Mot. Ex. A.  The letter also provides:

- "NAA will employ you as the Chief Operating Officer" (Paragraph 1);

3

- "The term of the employment agreement will be for a period of five (5) years" (Paragraph 2);

- "Your starting, base salary, will be Three Hundred Thousand ($250,000.) [sic] dollars per annum . . . . Some portion of this salary, to be agreed between NAA and JBF may be deferred until the close of financing" (Paragraph 3);

- "A seat on the BOD will be considered, at a later time" (Paragraph 4)

- "You shall be eligible to receive bonus and stock options, and any other benefits, as directed by the BOD" (Paragraph 5);

- "You shall receive corporate benefits as directed by the BOD" (Paragraph 6); and

- "Prior to the finalization of the employment agreement, not concurrently with, you will be required to sign the latest version of the Non-Circumvention & Non-Disclosure Agreement"[2] (Paragraph 11).

The March 6 letter also discusses equity compensation. Specifically, paragraph 7 of the letter states: "At the signing

---

[2] The Non-Circumvention & Non-Disclosure Agreement referred to in paragraph 11 of the March 6 letter is the same document as the Confidentiality & Non-Circumvention Agreement signed by Fetter and Reiser on March 16, 2006.

of your employment contract you shall be entitled to purchase 500,000 Class A Common shares of NAA at $0.01 per share.  This must be exercised within a 60-day period from date when full salary is being paid to you by NAA."  Paragraph 8 further provides:  "At any time during your employment agreement you are entitled to purchase an additional 500,000 shares of NAA Class A Common shares, at $0.01 per share."

The record does not contain evidence of any communications between Fetter and Reiser about Fetter's employment for approximately two months after Reiser signed the March 6 letter.  At some point after March 16, 2006, however, Fetter had his then-attorney prepare a draft of a document, entitled "Executive Employment Agreement" (the "EEA").[3]  This nine-page document, which the parties never signed, states that "this agreement is intended to formalize the terms" of the March 6 letter.  See Executive Employment Agreement, Defs.' Mot. Ex. E at 1.[4]

Among the terms included in the EEA are:

---

[3] Although there is no evidence in the record of when Fetter requested that the document be drafted, the date "05/06/06" appears in the upper right-hand corner of the document.

[4] The defendants have stated that they did not see the EEA until February 4, 2008, during the discovery process of this litigation.  See Mem. in Support of Defs.' Mot. to Compel at 3, Feb. 29, 2008.

- Specific start and end dates, as well as terms of renewal (Section I);
- Fetter's base salary, bases for salary increases, and pay periods (Section III);
- Provisions regarding retirement and medical plans, life insurance, and disability (Section IV);
- Paragraphs related to "additional compensation and benefits," including stock purchase rights (Section V);
- Terms governing the reimbursement of expenses (Section VI);
- A roughly three-page discussion of termination, including the terms under which either party could terminate the relationship (Section VII); and
- Provisions related to the governing law and the arbitration of disputes (Sections X-XI).

The EEA also contains blank terms, including the amount of Fetter's salary that would be deferred.  Id. at 2.

On or about April 26, 2006, NAA received a letter of intent from First Capital Partners ("FCP"), a New York-based investment company.  In this letter, FCP offered to buy NAA, as well as all of NAA's properties, agreements, and contracts.  See Letter from FCP to NAA, Apr. 26, 2006, Am. Compl. Ex. C.

On May 8, 2006, Reiser sent Fetter an email, in which Reiser wrote:  "Please see the attached revised employment agreement."  Attached to the email was a letter, dated May 8, 2006, also entitled "Employment With North American Alcohols, Inc." (the "May 8 letter").  This letter provided:

> I must apologize to you for revising the conditions of your employment.  However, I hope that these revisions will be acceptable and rewarding to you.  The changes are in paragraphs 7 & 8 below.  Please consider this letter as non-binding and any finalization of the below terms and conditions, [sic] must be done by formal contract, between NAA and yourself.

See Email and letter from Stephen C. Reiser, May 8, 2006, Pl.'s Resp. Ex. D.[5]

Paragraph 7 of the May 8 letter provides:  "At the signing of your employment contract, as a bonus, you shall be given a 1% interest in NAA stock with a par value of $1,250,000. or cash of $1,250,000. if First Capital Partners purchases NAA." Paragraph 8 of the May 8 letter provides:  "The NAA BOD has

---

[5] Although the introductory paragraph of the letter focuses upon the changes to paragraphs 7 and 8, paragraphs 3, 6, and 10 also contain changes.  Paragraph 3 corrects the typographical error in the March 6 letter, which had stated that Fetter's salary would be "Three Hundred Thousand ($250,000.) [sic] dollars per annum."  In the May 8 letter, Fetter's compensation is "Three Hundred Thousand ($300,000.) dollars per annum."  Paragraph 6 of the May 8 letter, unlike paragraph 6 of the March 6 letter, does not mention a minimum hour requirement for Fetter, and Paragraph 10 of the May 8 letter removes discussion of scheduling conflicts, which had appeared in the March 6 letter.

agreed to share on a yearly basis, 10% of the free cash flow with all NAA stockholders, in proportion to their NAA stock ownership. You will participate in this event in addition to your regular salary."

The final paragraph of the May 8 letter states:

I look forward to seeing you tomorrow in Florida and finalizing the above.  Upon agreement, I will instruct our attorney's [sic] at Greenberg Traurig to draft a formal contract.

Id. at 2.  On May 9, 2008, Fetter attended a meeting of the NAA board of directors in Tampa.  At this meeting, the members of the board informed Fetter that they did not approve the terms of the March 6 letter.  Fetter told the board that they already had an agreement, and that he did not accept the terms of the May 8 letter.  Fetter Dep. 146-149; Reiser Dep. 119-120.

The next day, May 10, 2006, Fetter traveled to Radnor, Pennsylvania, for a meeting that Reiser was also attending.  At the meeting, Fetter handed Reiser a letter.  In this letter, Fetter wrote:  "I do not accept the proposed changes to our executed agreement of March 6, 2006, particularly the changes in percentage ownership of NAA and stock purchase rights granted to me . . . I am proceeding to continue to work with you and NAA per the terms of our March 6, 2006 agreement, including full participation in today's meeting . . . ."  Reiser then told Fetter that Fetter no longer represented NAA.  See Letter from

John B. Fetter to Stephen C. Reiser, May 10, 2006, Am. Compl. Ex.
E; Fetter Dep. 148-150; Reiser Dep. 124-25.

By letter dated May 17, 2006, Theodore Mason, an
attorney, wrote to Fetter on behalf of NAA to notify him "that
contrary to your May 10, 2006 letter to Steve Reiser, you are not
authorized in any way to represent or work for [NAA] and that you
must cease any and all activities on behalf of NAA . . . . The
letter of March 6, 2006 you presented to Steve Reiser for his
signature was not a finalized, fully negotiated contract of
employment, was subject to NAA board approval and, in any event,
was materially altered by you without notice to Steve before he
signed the document."[6]  See Letter from Theodore W. Mason to John
B. Fetter, May 17, 2006, Am. Compl. Ex. F.

The parties do not dispute that between February and
May 2006, Fetter engaged in activities related to NAA's business.
Although the extent to which NAA benefited from these activities
is in dispute, there is no dispute that Fetter spent time
researching ethanol, attending meetings, looking over NAA's

---

[6] In at least two earlier drafts of the letter, the first
paragraph contained the language, "Please consider this letter as
non-binding. . . ."  In his deposition, Reiser stated that before
signing the March 6 letter on March 16, 2006, he only glanced at
the letter briefly and asked Fetter whether he had made any
changes to the document.  According to Reiser, Fetter said that
he had not made any material changes.  At his deposition, Reiser
claimed that the word, "non-binding," which does not appear in
the March 6 letter, was deleted from the letter without his
knowledge.  Reiser Dep. 47-49.  The record does not show when the
word, non-binding, was deleted and by whom.

business forms, and communicating with potential financial investors and political contacts.

At the same time that Fetter was reaching out to potential financiers and political contacts, Sean Reilly, a lobbyist who has acted on behalf of NAA on legislative and political issues, obtained a legislative grant for NAA.  The grant could not be given directly to NAA, however; instead, it needed to be transmitted using a 501(c)(3) nonprofit organization as a conduit.  Reilly emailed Fetter on April 26, 2006, to ask for Fetter's help in finding such an organization.  Fetter replied to Reilly's email on April 27, 2006, and told him, "We should do this through SMART."  SMART, a nonprofit organization whose full name is Strengthening the Mid-Atlantic Region for Tomorrow, agreed to, and ultimately did, serve as this conduit. In October 2006, NAA received the funds from the legislative grant through SMART.  See Email from John Fetter to Sean Reilly, Apr. 27, 2006, Defs.' Mot. Ex. I,;  Aff. of Sean M. Reilly, Esq. ("Reilly Aff.") ¶¶ 1, 9; Fetter Dep. 75-80, 179-80; Reiser Dep. 38-40.

According to a list of activities prepared by Fetter, between January 2006 and May 8, 2006, Fetter spent over nine-hundred hours performing activities related to NAA's business.  As of the date of that this lawsuit was filed, the

plaintiff had not received compensation for any work done on behalf of NAA.  <u>See</u> List of Activities, Defs.' Mot. Ex. H.

Fetter filed this suit in the Court of Common Pleas of Philadelphia County on August 8, 2006.  The defendants removed the case to this Court on September 13, 2006.  In his original complaint, Fetter named NAA and Reiser as defendants, as well as William Lightner and Edward Grant, members of the NAA board of directors, and Lynn Reiser, Stephen Reiser's wife and a director of NAA.  The plaintiff sued NAA for breach of contract, and the corporation and its individual directors for unjust enrichment. The plaintiff also brought a count against all individual defendants for tortious interference with contractual relations, and a count against NAA and Stephen Reiser for defamation.

On February 16, 2007, the Court dismissed all of the claims against all the individual defendants other than Stephen Reiser, and dismissed Fetter's defamation and tortious interference claims against all the defendants.  On August 21, 2007, the plaintiff filed a motion to amend his complaint, which the Court granted on September 11, 2007.  Fetter filed an amended complaint on September 20, 2007.

In his amended complaint, Fetter brought five counts: (1) against NAA for breach of contract (Count I); (2) against NAA for declaratory judgment that NAA breached its contractual obligations and that the contract between the parties remains

11

enforceable (Count II); (3) against NAA for an injunction preventing NAA from transferring any assets without establishing proper reserves for the amounts contractually owed to Fetter (Count III); (4) against NAA and Reiser for unjust enrichment (Count IV); and (5) against NAA and Reiser for violation of the WPCL (Count V). Included in Fetter's damages calculation are unpaid salary and expenses, as well as the value of any proceeds that he would have been entitled to as a shareholder upon sale of NAA to FCP.[7]

II.      <u>Analysis</u>

        The defendants have moved for summary judgment on the plaintiff's claims arguing that (1) the March 6 letter itself was not a contract because it contained language expressly requiring that the parties execute a formal contract, (2) Fetter's WPCL claim must fail because no wages were contractually due to the plaintiff, and (3) neither Reiser nor NAA was unjustly enriched because neither retained any benefit from the plaintiff's activities or from his connections. The Court will grant summary judgment on the breach of contract and WPCL claims, but will deny summary judgment on the unjust enrichment claim.[8]

---

        [7] This sale did not occur. <u>See</u> Email from Kevin Ward, Apr. 12, 2007, Defs.' Mot Ex. D; Fetter Dep. 157; Reiser Dep. 65-66.

        [8] In their motion for summary judgment, the defendants also request that the Court dismiss Counts II and III of Fetter's

A.   <u>Breach of Contract</u>

Under Pennsylvania law, an agreement is enforceable as a contract only if both parties have manifested an intention to be bound by its terms, if those terms are sufficiently definite to be enforced, and if there is consideration.  <u>Blair v. Scott Specialty Gases</u>, 293 F.3d 595, 603 (3d Cir. 2002).  Evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract. <u>ATACS Corp. v. Trans World Commc'ns, Inc.</u>, 155 F.3d 659, 666 (3d Cir. 1998).

In determining whether there is intent to be bound, courts must examine the entire document in question and the circumstances surrounding its adoption.  <u>Channel Home Ctrs. v. Grossman</u>, 795 F.2d 291, 299 (3d Cir. 1986).  Where one party expresses an intent not to be bound until a written contract is executed, the parties are not bound until the execution of a written contract occurs.  <u>Schulman v. J.P. Morgan Inv. Mgmt., Inc.</u>, 35 F.3d 799, 808 (3d Cir. 1994) (citing <u>Essner v. Shoemaker</u>, 143 A.2d 364, 366 (Pa. 1958)).

Here, an intent <u>not</u> to be bound is evident on the face of the March 6 letter.  The first paragraph explicitly states that the letter was only an outline of the terms and conditions

---

amended complaint as moot.  Defs.' Mot. at 5 n.1.  Because the Court finds that NAA was not contractually obligated to Fetter, these counts will be dismissed.

that the parties had discussed, "which must be formalized in a contract."  The March 6 letter thus indicated, on its face, that the execution of a formal contract <u>must</u> take place before NAA would consider itself bound.[9]

Fetter argues that where the parties agree on the essential terms of a contract, the fact that they have not yet formalized an agreement in writing does not prevent enforcement of the agreement.  <u>See</u> Pl.'s Resp. at 8 (citing <u>Mazzella v. Koken</u>, 739 A.2d 531, 536 (Pa. 1999);  <u>see also</u> <u>Flight Sys., Inc. v. Elec. Data Sys. Corp.</u>, 112 F.3d 124, 129 (3d Cir. 1997).  This is true where the later writing is simply intended as a mere formality, or as evidence of the earlier agreement.  <u>Flight Sys., Inc.</u>, 112 F.3d at 129.  It is not true, however, where the parties themselves contemplated that their agreement would not be considered complete or enforceable without being reduced to writing.  <u>Schulman</u>, 35 F.3d at 807-08; <u>Essner</u>, 143 A.2d at 366. Here, the March 6 letter provided that its terms <u>must</u> be formalized in a contract.  This is not a case where a later writing was intended merely as evidence of an earlier agreement.

---

[9] Although previous versions of the letter, as well as the May 8 letter, further stated that the letter was non-binding, the Court finds that even without that additional language, the March 6 letter sufficiently emphasizes NAA's intent not to be bound until the execution of a formal written contract.  Thus, regardless of who may have deleted the word, non-binding, from the letter, any uncertainty on this point does not create an issue of material fact.

To the contrary, the March 6 letter, in serving as a written outline of the terms and conditions discussed, explicitly required the execution of a formal contract.

Although the plain language of the first paragraph of the March 6 letter is alone sufficient to demonstrate that NAA did not manifest an intent to be bound by the letter itself, other provisions lend further support.  The letter specifically contemplates the subsequent creation of an employment agreement to formalize several of its terms.  Paragraph 2 states that "the employment agreement will be for five years."  Paragraph 7 states that the plaintiff would be permitted to purchase shares "at the signing of your employment contract."  Paragraph 8 further states that the plaintiff could purchase further shares "at any time during your employment agreement."  Finally, paragraph 11 provides that Fetter must sign the non-disclosure agreement "prior to," and "not concurrently with," the "finalization of the employment contract."  This language, viewed in the context of the document as a whole, reinforces the fact that the letter itself was only an outline of terms and conditions, and that NAA contemplated the execution of a separate employment agreement or contract by which it would be bound.[10]

---

[10] That NAA contemplated the execution of a future contract is also reinforced by the language of the May 8 letter, in which Reiser wrote that he was apologizing for revising the conditions of Fetter's employment, and that "upon agreement," he would instruct NAA's attorneys "to draft a formal contract."  Although

Fetter in fact created such an agreement - the nine-page EEA that he had his attorney prepare.  The proposed EEA not only formalizes certain terms of the March 6 letter, such as the provisions related to Fetter's corporate benefits; it also clarifies other terms of the letter by, for example, specifying the precise term of Fetter's employment, correcting the salary term, and providing a term describing how Fetter's salary would be paid.  The EEA also adds new terms that do not appear in the March 6 letter, such as reimbursement, arbitration, and termination provisions.  The EEA even contains blank terms.  Although Fetter argues that these terms were not essential, and that the terms of the March 6 letter bind the parties, the fact that Fetter prepared a further contract that not only formalizes the terms of the March 6 letter, but also clarifies and supplements them, reinforces the Court's conclusion that the March 6 letter was not intended to be binding.

---

the Court finds the March 6 letter alone sufficiently dispositive of NAA's intent not to be bound, the language of the May 8 letter is also consistent with the fact that the March 6 letter was merely an outline of terms and conditions.  Although Fetter contends that the changes made in the May 8 letter were done in response to the purchase offer from FCP in an attempt to diminish Fetter's ownership interest, and thus, his compensation upon completion of the sale, under Pennsylvania law, it is the parties' outward manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter in determining intent to be bound.  Espenshade v. Espenshade, 729 A.2d 1239, 1243 (Pa. Super. Ct. 1999).

16

B.   <u>WPCL Claim</u>

The Pennsylvania Wage Payment Collection Law ("WPCL")
allows an employee to collect wages that an employer owes him
contractually.  43 Pa. Cons. Stat. §§ 260.1-301.  The WPCL does
not create a right to compensation, but rather, merely provides
employees a statutory remedy to recover wages and other benefits
that are already due to them as a matter of contract.  <u>De Asencio
v. Tyson Foods, Inc.</u>, 342 F.3d 301, 309 (3d Cir. 2003); <u>Oberneder
v. Link Computer Corp.</u>, 696 A.2d 148, 150 (Pa. 1997).  Here, NAA
did not have a binding employment contract with Fetter, and no
wages were contractually due to him.  The Court will therefore
grant summary judgment to the defendants on this claim.


C.   <u>Unjust Enrichment (Quasi-Contract) Claim</u>

As an alternative to contractual recovery, Fetter
argues that the defendants are liable to him in quasi-contract,
in that they have been unjustly enriched by the services he
performed on their behalf.  Because Reiser personally retained no
benefit from Fetter's services, the Court will grant summary
judgment to Reiser on this claim.  As to NAA, however, a genuine
issue of material fact exists regarding whether Fetter's services
created benefits that NAA has retained.  The Court will therefore
deny NAA's motion for summary judgment on this claim.

17

1.   <u>As to Reiser</u>

Under Pennsylvania law, a quasi-contract claim exists where one party receives unjust enrichment at the expense of another.  <u>Ne. Fence & Iron Works, Inc. v. Murphy Quigley Co.</u>, 933 A.2d 664, 668 (Pa. Super. Ct. 2007) (quoting <u>Lackner v. Glosser</u>, 892 A.2d 21, 34 (Pa. Super. Ct. 2006)).  Fetter has not shown that Reiser unjustly retained any benefit from his activities. At oral argument, counsel for Fetter conceded that Fetter did not perform any services for Reiser in his personal capacity, and that any quasi-contract claim is against NAA.  <u>See</u> Oral Arg. Tr. at 12, Sept. 17, 2008.  The Court will grant summary judgment to Reiser on this claim.

2.   <u>As to NAA</u>

To prevail on his quasi-contract claim against NAA, the plaintiff must show (1) that he conferred benefits on NAA; (2) that NAA appreciated such benefits; and (3) that NAA accepted and retained such benefits under such circumstances that it would be inequitable or unconscionable for NAA to retain those benefits without payment of value.  <u>United States v. St. John's Gen. Hosp.</u>, 875 F.2d 1064, 1074 (3d Cir. 1989); <u>Ne. Fence & Iron Works</u>, 933 A.2d at 669 (quoting <u>Lackner</u>, 892 A.2d at 34).  The Court's focus in analyzing this claim is not on the parties' intentions, but rather, on whether the defendant has been

18

unjustly enriched.  <u>Mitchell v. Moore</u>, 729 A.2d 1200, 1204 (Pa. Super. Ct. 1999).  Application of the doctrine of unjust enrichment depends on the particular factual circumstances of each case.  <u>Mitchell</u>, 729 A.2d at 1203-04.

The plaintiff has provided a list of activities he engaged in while in the service of NAA, totaling over nine-hundred hours of work.  In addition, Fetter claims that he played a critical role in introducing NAA to SMART, and that he is responsible for NAA's receipt of the $250,000 grant.[11]  NAA, on the other hand, insists that it retained no benefit from any of Fetter's activities, and that the individual responsible for SMART's involvement in the grant process was actually Reilly.  <u>See</u> Defs.' Mot. Ex. H; Fetter Dep. 75-77, 80-82; Reilly Aff. ¶ 4.

The Court takes no position on these issues, and finds that genuine issues of material fact remain as to whether NAA received any benefits from Fetter's activities, and whether or not it would be unconscionable for NAA to retain such benefits. Summary judgment on this claim is therefore inappropriate.

An appropriate Order follows.

---

[11] For example, Fetter argues that NAA had no connection to SMART prior to his involvement, and that NAA may not have received the grant if not for his suggestion to work with SMART. <u>See</u> Fetter Dep. 75-76; <u>see also</u> Emails from Sean Reilly and Bob Carullo, Defs.' Mot. Ex F.  In response, the defendants provide a statement by Reilly - who is now a board member of NAA - that Reilly's relationships with individuals at SMART convinced SMART to act as a conduit for the legislative grant.  Reilly Aff. ¶ 4.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN B. FETTER                 :      CIVIL ACTION
                               :
          v.                   :
                               :
NORTH AMERICAN ALCOHOLS,       :
INC., et al.                   :      NO. 06-4088

_____      ORDER

          AND NOW, this 10th day of December, 2008, upon
consideration of the defendants' Motion for Summary Judgment
(Docket No. 50), the plaintiff's opposition thereto (Docket No.
56), and the defendants' reply thereto (Docket No. 58), and upon
further consideration of the arguments raised at oral argument on
September 17, 2008, IT IS HEREBY ORDERED, for the reasons stated
in the accompanying Memorandum of this date, that the defendants'
motion is GRANTED IN PART and DENIED IN PART, as follows:

          1.   With respect to the plaintiff's claims for breach
               of contract (Count I) and violation of the
               Pennsylvania Wage Payment and Collection Law
               (Count V), the defendants' motion is GRANTED.

          2.   With respect to the plaintiff's quasi-contract
               claim (Count IV), the defendants' motion is
               DENIED.

3.    The plaintiff's requests for declaratory and
      injunctive relief (Counts II and III) are
      DISMISSED.


                        BY THE COURT:


                        /s/ Mary A. McLaughlin
                        MARY A. McLAUGHLIN, J.